**David DAY, et al., Plaintiffs,**

v.

**NLO, INC., et al., Defendants.**

**No. C-1-90-67.**

United States District Court,
S.D. Ohio, W.D.

Nov. 20, 1992.

Thomas Joseph Kircher, Kircher, Robinson, Cook, Newman & Welch; Paul M. De Marco, Waite, Schneider, Bayless & Chesley Co.; and Allen Paul Grunes, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, for plaintiffs.

William Howard Hawkins, II, Frost & Jacobs; John Stephen Wirthlin, Sr., Kevin T. Van Wart, Douglas James Kurtenbach, Beirne & Wirthlin, Cincinnati, OH; Herbert L. Fenster, McKenna, Conner & Cuneo, · Washington, DC; and David M. Bernick, Kirkland & Ellis, Chicago, IL, for defendants.

ORDER DENYING MOTION TO RECONSIDER, GRANTING MOTION TO DISMISS CERTAIN COUNTS FOR EMPLOYEES, AND DENYING MOTION FOR A PETITION AND PLAN

SPIEGEL, District Judge.

This matter is before the Court on the following items: the Defendants' Motion to Dismiss (doc. 290), the Petition and Plan by the Plaintiffs (doc. 293), the Plaintiffs' Response to the Motion to Dismiss (doc. 294),

the Defendants' Response to the Plaintiffs' Petition and Plan (doc. 295), the Defendants' Motion to Reconsider (doc. 296), the United States' Memorandum (doc. 297), the Plaintiffs' Reply concerning the Petition and Plan (doc. 299), the Defendants' Reply concerning the Motion to Dismiss (doc. 300), the Plaintiffs' Response to Reconsideration (doc. 302), and the Defendants' Reply concerning Reconsideration (doc. 303).

## BACKGROUND

The Defendants in this case operated the Feed Materials Production Center ("FMPC") located in Fernald, Ohio. At the FMPC, National Lead of Ohio, Inc. ("NLO")[1] was involved in certain aspects of the development and manufacture of nuclear weapons for the country's armed services.

The Plaintiffs in this case brought suit in 1990, alleging ten counts in their First Amended Complaint. *See* doc. 31. In Count I, the Plaintiffs allege that the Defendants acted negligently in running the FMPC. In Count II, the Plaintiffs contend that the Defendants should be held strictly liable for conducting abnormally dangerous activities at the FMPC. The Plaintiffs allege in Count III that the Defendants engaged in fraudulent concealment of the Plaintiffs' excessive exposure to radioactive and other hazardous materials. Count IV involves further claims of negligence. In Count V, the Plaintiffs ambiguously allege violations of the Atomic Energy Act. Various intentional torts are claimed in Count VI. The Plaintiffs allege in Count VII that the Defendants breached their contract with the United States government, and that the Plaintiffs have been damaged as third party beneficiaries. In Count VIII, the Plaintiffs allege violations of the Ohio Frequenter Statute. The Plaintiffs contend in Count IX that NLO's directors breached their duty of care to the corporation. Finally, in Count X, the Plaintiffs state that "... Defendants acted with conscious disregard for the safety and rights of Plaintiffs and others that had a

great probability of causing substantial harm, and/or engaged in misconduct which was willful, wanton, fraudulent, and grossly negligent, and which resulted from Defendants' bad faith in operating the FMPC." Plaintiffs' First Amended Complaint, doc. 31, ¶ 85, at 40.

The Defendants moved to dismiss the Complaint as barred by the applicable statute of limitations. Because factual disputes existed, this Court held a lengthy trial on whether the Plaintiffs were time-barred. The jury found that some of the Plaintiffs could continue in their lawsuit, while others were barred under the statute of limitations.

In light of the jury's determination in the statute of limitations trial, the Court granted the Plaintiffs' Motion for Class Certification (doc. 281). The Court defined the class as follows:

> [a]ll employees and contractors of defendant NLO, Inc. and the employees of NLO contractors who were present at the Feed Materials Production Center for six continuous weeks and who were no longer present at the FMPC after December 31, 1981. This class does not include any persons who were members of the class certified in *In re: Fernald Litigation*, Case No. C–1–85–149.

Doc. 292, at 1.

## DEFENDANTS' MOTION TO RECONSIDER OR FOR INTERLOCUTORY APPEAL

The Defendants have moved this Court to reconsider its decision certifying a class. In the alternative, the Defendants request that this Court allow an interlocutory appeal according to 28 U.S.C. § 1292 (1992) on the Court's certification of this lawsuit as a class action. The Defendants have three basic grounds for their motion. We shall examine these arguments briefly, as the Court has already considered many of these arguments in earlier Orders.

NLO's first argument is that this Court's certification of a class under Fed.R.Civ.P.

---

**1.** The Court recognizes that National Lead Industries, Inc. is also a Defendant to this action. The Court, however, will refer solely to NLO, out of convenience.

23(b)(2) is improper. Under Fed.R.Civ.P. 23(b)(2), a class action is appropriate if:

> ... the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole....

Thus, a Fed.R.Civ.P. 23(b)(2) class is proper only when an equitable remedy is the principal relief requested. Fed.R.Civ.P. 23(b)(2), Notes of Advisory Committee on Rules; *In re Fernald Litig.*, 1986 WL 81380, n. 5 (S.D.Ohio 1986) (J. Spiegel).

■ NLO argues that in this lawsuit the Plaintiffs are seeking compensatory and punitive damages. However, as this Court has already stated, the Plaintiffs primarily request relief by way of a *court-supervised* medical monitoring program. In its Motion to Reconsider, NLO fails to grasp central aspects of this Court's earlier Order. An injunction ordering the Defendants to participate in a court-supervised medical monitoring program would certainly cause the Defendants to pay money. However, this money would not be paid directly to the Plaintiffs, as a traditional remedy at law would. Instead, any money that NLO would provide would be placed in a special fund, administered by the Court via trustees for the benefit of the class. The Defendants would also have to take appropriate actions, as the Court requires, in order for the Court to implement and administer a medical monitoring program fairly. In other words, all parties—the Plaintiffs, the Defendants, the Court, and the trustees—would have to work together to ensure a successful medical monitoring program of this type.[2]

Thus, if medical monitoring program is necessary, the Court intends not to dump money on the Plaintiffs so that they have the financial wherewithal to see a doctor; but rather, the Court intends to administer a plan involving regular physical examinations of class members and ongoing epidemiological studies. Because of ongoing court supervision, any medical monitoring awarded by this Court would constitute equitable relief. *See e.g., Cook v. Rockwell Int'l Corp.*, 778 F.Supp. 512, 515 (D.Colo. 1991); *Werlein v. United States*, 746 F.Supp. 887, 895 (D.Minn.1990), *vacated, claim settled* 793 F.Supp. 898 (1992) (although the issue was not addressed in the context of Fed.R.Civ.P. 23(b)(2)); *Barth v. Firestone Tire & Rubber Co.*, 661 F.Supp. 193 (N.D.Cal.1987) (same).

■ NLO further argues that a class is not sustainable under Fed.R.Civ.P. 23(b)(2), because any class action under Fed.R.Civ.P. 23(b)(2) must involve the alteration of the ongoing conduct by a defendant. *See e.g., Gould v. Sullivan*, 131 F.R.D. 108, 115 (S.D.Ohio 1989); *Cottrell v. Lopeman*, 119 F.R.D. 651, 657 (S.D.Ohio 1987). However, as discussed above, if it is determined at trial that medical monitoring is necessary, this Court envisions a medical monitoring program that would alter the Defendants' conduct. The Defendants conduct would be altered, because this Court would compel the Defendants to participate in the medical monitoring program. The Defendants, on an ongoing basis, would have to provide pertinent data regarding employees' health records and information concerning employees' exposures to radioactive substances at the FMPC.

■ The Defendants further contend that class certification should be precluded because any relief that is awarded will not apply to the class as a whole. We disagree. The trial to be held in June 1993 will determine the merits of the Plaintiffs' claims, including whether medical monitoring should be instituted. If medical monitoring is found to be necessary, the entire class would be entitled this relief. Of course, class members would have to participate in some sort of claims procedure whereby individual differences are taken into account. Still, Fed.R.Civ.P. 23(b)(2) would not be violated, because a medical monitoring program would either apply or not apply to the class as a whole.

**2.** We note, however, that no decision as to the merits of this case has been reached. Thus, medical monitoring will only be awarded if the evidence presented at trial so merits.

■ NLO's second argument behind its motion for reconsideration is that the class definition adopted by the Court was arbitrary. In its opinion concerning class certification, the Court ordered that the Defendants submit proposed class definitions by July 15, 1992. The Defendants failed to follow the Court's Order. In fact, the Court admonished Defendants' counsel that "... this Court has no intention of reversing its class certification decision now or in the future." Doc. 288, at 1–2. On August 19, 1992, the Court held a status conference in the litigation, and Defendants' counsel failed to suggest a proposed class definition—opting instead to criticize the Court's decision to certify a class. *See* Affidavit of Douglas J. Kurtenbach, doc. 296, exh. B, at ¶ 13.

By following this strategy, NLO cannot now claim that the class definition is improper. NLO has a right to disagree with, and eventually appeal, this Court's decision to certify a class action. Once the Court has made that decision, however, NLO must continue to pursue this litigation properly and follow the Court's Orders. By failing to abide by this Court's Orders, NLO cannot sit back and subsequently criticize this Court's class definition in a Motion for Reconsideration. As a result of its actions, NLO effectively waived its right to oppose the class definition before this Court. Accordingly, this Court reaffirms its earlier definition of the class in this case.

■ The Defendants' third argument in its Motion is that if the Court is unwilling to vacate its Order certifying a class, the Court should permit an interlocutory appeal under 28 U.S.C. § 1292. Under that provision, the Court may certify for appellate review an order "... that involves a controlling question of law as to which there is substantial ground for difference of opinion **and** [from which] an immediate appeal ... may materially advance the ultimate termination of the litigation...." *Id.* (emphasis added).

This Court agrees with the Defendants' assertion that this case has involved uncharted, novel issues in the law. However, an immediate appeal should be granted only if such an appeal would materially advance the final resolution of the litigation. We do not believe that an immediate appeal would further an end to this case. Instead, we fear that an appeal would delay by several years the ultimate termination of this case.

Accordingly, the Defendants' Motion for Reconsideration and Interlocutory Appeal is denied.

## DEFENDANTS' MOTION TO DISMISS

The Defendants have moved to dismiss all counts contained in the Plaintiffs' First Amended Complaint, other than Count VI, which is a claim for intentional tort.[3] The Defendants assert that the Plaintiffs' other counts are impermissible in light of the exclusivity of an employee's remedy under the law of workers' compensation.

### Standard of Review

This Court has before it a motion to dismiss for "... failure to state a claim upon which relief can be granted." Fed. R.Civ.P. 12(b)(6). In reviewing a motion to dismiss, this Court must accept as true all allegations in the Complaint. *Westlake v. Lucas*, 537 F.2d 857 (6th Cir.1976). Then, the Court must determine whether the Plaintiff's allegations, when accepted as true, are sufficient to proceed with the lawsuit. Thus, a motion to dismiss should not be granted " '... unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* at 858 (quoting *Conley v. Gibson*, 355 U.S. 41, 45, 46, 78 S.Ct. 99, 101, 102, 2 L.Ed.2d 80 (1957).

### Workers' Compensation Law

■ State legislatures have enacted workers' compensation laws as social legislation designed to benefit workers and employers. The notion of workers' compensa-

---

**3.** The Defendants fail to state which rule of Federal Civil Procedure they rely upon for their Motion. *See* docs. 290, 300. The Court assumes that the Defendants have made their Motion based upon Fed.R.Civ.P. 12(b)(6).

tion emanated in England, and spread to the United States in the early 1900's—in the wake of the human cost of the industrial revolution. *See* Laura Quackenbush, Note, *Workers' Compensation Exclusivity and Wrongful Termination Tort Damages: An Injurious Tug of War?*, 39 *Hastings L.J.* 1229, 1231 (Aug.1988) [hereinafter Quackenbush, *Workers' Compensation* ].

■ The Ohio Constitution provides the state legislature with the authority to pass workers' compensation laws.[4] In giving this power to the legislature, the Ohio Constitution states the basic principle behind workers' compensation:

Such compensation shall be in lieu of all other rights to compensation, or damages, for such death, injuries, or occupational disease, and any employer who pays the premium or compensation provided by law, passed in accordance herewith, shall not be liable to respond in damages at common law or by statute for such death, injuries, or occupational disease.

Art. II, § 35. Under this Constitutional authority, the Ohio legislature set forth the basic principle of workers' compensation:

Except as authorized in section 4121.80 of the Revised Code,[5] **employers who comply** with section 4123.35 of the Revised Code, **shall not be liable to respond in damages at common law or by statute for any injury, or occupational disease, or bodily condition, received or contracted by any employee in the course of or arising out of his employment,** or for any death resulting from such injury, occupational disease, or bodily condition occurring during the period covered by such premium so paid into the state insurance fund, or during the interval of time in which such employer is

permitted to pay such compensation directly to his injured employees or the dependents of his killed employees, whether or not such injury, occupational disease, bodily condition, or death is compensable under section 4123.01 to 4123.94 of the Revised Code.

Ohio Rev.Code § 4123.74 (emphasis added). In other words, when an employee is injured by conditions that arise out of his or her employment, the employee is automatically compensated under Ohio's workers' compensation system, regardless of the employer's culpability for the employee's injuries. Because of the employee's right to automatic compensation, the employee waives the right to sue his or her employer for the work-related injuries he or she has sustained. Similarly, the employer waives its right to defenses that might thwart the employee's action in tort. Quackenbush, *Workers' Compensation*, at 1231. Thus, workers' compensation was formulated to provide compensation for all employees hurt on the job and to deter conduct resulting in injuries. Jean Macchiaroli Eggen, *Toxic Reproductive and Genetic Hazards in the Workplace: Challenging the Myths of the Tort and Workers' Compensation Systems*, 60 *Fordham L.Review* 843, 868 (April 1992).

■ An exception to the exclusive nature of relief for work-related injuries occurs when an employer commits an intentional tort against an employee. *Blankenship v. Cincinnati Milacron Chems., Inc.,* 69 Ohio St.2d 608, 433 N.E.2d 572, *cert. denied* 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982); *see also Jones v. VIP Dev. Co.,* 15 Ohio St.3d 90, 94, 472 N.E.2d 1046, 1050–1051 (1984) ("[b]ut where the injury suffered at the workplace is not intentionally inflicted the employee's *sole* avenue of

---

4. Ohio law is applicable to the case before the Court as long as it does not conflict with the Price–Anderson Act. *See* 42 U.S.C. § 2014(hh) (public liability actions shall be determined under "... the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of [the Price–Anderson Act].")

5. We note that the Ohio Supreme Court has held Ohio Rev.Code § 4121.80 to be unconstitutional.

*Brady v. Safety–Kleen Corp.,* 61 Ohio St.3d 624, 576 N.E.2d 722 (1991). However, the intentional tort exception to workers' compensation law was not abandoned; rather, the Ohio Supreme Court in *Brady* reaffirmed its decision in *Blankenship* to allow an employee to sue his employer for an intentional tort. *Id.* 61 Ohio St.3d at 635, 576 N.E.2d at 722.

recovery is through the workers' compensation system") (emphasis added). The Ohio Supreme Court has carved out an exception to the exclusivity of the workers' compensation system with intentional torts, because an intentional tort necessarily occurs outside the employment relationship. *Brady*, 61 Ohio St.3d at 635, 576 N.E.2d at 722.[6]

Thus, in the matter before this Court, the Plaintiffs' claim for intentional tort is viable and will be tried.

### Whether Plaintiffs' Other Claims Are Barred

In light of the law of workers' compensation, the Defendants have moved to dismiss all the Plaintiffs' claims other than intentional tort. The Plaintiffs argue that their claims other than intentional tort are not excluded by Ohio workers' compensation law. The Plaintiffs' reasons are as follows: (1) workers' compensation does not bar the Plaintiffs' claims, because their claims are asserted under the Price–Anderson Act; (2) the Plaintiffs' have not suffered an "injury" under the law of Ohio workers' compensation; (3) the 1986 amendments to Ohio workers' compensation law demonstrate that the Ohio legislature did not intend mental injuries to receive benefits under workers' compensation; (4) the dual capacity doctrine permits the Plaintiffs to sue in tort; (5) workers' compensation does not act as a bar because the Defendants tortiously concealed information concerning employees' workplace exposures; and (6) workers' compensation does not bar the Plaintiffs' claims against NL Industries, because the Plaintiffs were not employees of NL Industries. We shall examine these arguments in turn.

### A. Price–Anderson Act

■ The Plaintiffs first contend that because they have asserted claims under the Price–Anderson Act, workers' compensation does not act as a bar. The jurisdiction of this Court over this case rests upon the Price–Anderson Act, 42 U.S.C. §§ 2011–2286h. Under this Act, a federal court has jurisdiction over any "... public liability action arising out of or resulting from a nuclear incident...." *Id.* at § 2210(n)(2). Congress defined a "nuclear incident" as any occurrence causing "... any bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." *Id.* at § 2014(q).

In *Building & Constr. Trades Dept. v. Rockwell Int'l Corp.*, 756 F.Supp. 492 (D.Colo.1991), the court considered the claims of plant workers at the Rocky Flats Nuclear Weapons Plant in Colorado. The Plaintiffs' claims in *Building & Constr.* are similar to those of the Plaintiffs' in this case. In light of the statutory definitions under the Price–Anderson Act, the court concluded:

> Bodily injury, sickness or disease necessarily entails personal injury. Either plaintiffs' claims are for bodily injury, sickness or death—and hence personal injury claims subject to the Act's exclusivity provisions—or this court has no Price–Anderson jurisdiction. In either event, plaintiffs' claims fail.

*Id.* at 494.

Still, the Plaintiffs in this case maintain that their claims are not barred by the exclusivity provisions of workers' compensation. The Plaintiffs note that the release of radioactive source material that causes property damage constitutes a nuclear incident under the Price–Anderson Act. *Id.* at § 2014(q). The Plaintiffs conclude that because they have suffered property damage,

---

**6.** The Ohio courts have established that a plaintiff must meet a three-pronged test in order to show that a defendant intended to harm the plaintiff-employee by tortious conduct. The plaintiff must demonstrate in the first prong that the employer knew of the existence of a dangerous process, procedure, instrumentality, or condition within its business operation. *Fyffe v. Jeno's, Inc.,* 59 Ohio St.3d 115, 570 N.E.2d 1108 (1991). Second, the plaintiff must show that the employer knew that the employee was substantially certain to be injured if the employee continued participating in a dangerous process, procedure, instrumentality, or condition. *Id.* In the final prong, the plaintiff must demonstrate that the employer forced the plaintiff-employee to continue his or her performance of the dangerous task. *Id.*

a nuclear incident under the Price–Anderson Act has occurred at the FMPC.

We find this argument to be unpersuasive, however. The named Plaintiffs have admitted that they do not have claims for property damage. *See* Interrog. Responses, Nos. 21, Sept. 28, 1992, of F. Davis, E. Hust, M. Adams, J. Dorton, and J. Johnson (attached to Defendants' Reply, doc. 300) (named Plaintiffs state in interrogatories that they have no damage to their property). Because this Court has based its jurisdiction upon the Plaintiffs' alleged personal injuries from a public liability action involving a nuclear incident, those very same personal injury claims are compensable through workers' compensation. *See* Ohio Rev.Code § 4123.74.

### B. Ohio Statutory Analysis

■ In their second argument, the Plaintiffs assert that the tort damages they seek under Ohio law are not barred by workers' compensation. The Plaintiffs contend that the injuries they have suffered from do not qualify as compensable injuries under workmens' compensation in Ohio. Specifically, the Plaintiffs argue that "injury," as defined in Ohio Rev.Code § 4123.01(C), does not encompass their emotional distress injuries.

The Ohio legislature has defined the term "injury" broadly:

(C) 'Injury' includes any injury, whether caused by external accidental means or accidental in character and result, received in the course of, and arising out of, the injured employee's employment. 'Injury' does not include:

(1) Psychiatric conditions except where the conditions have arisen from an injury or occupational disease....

*Id.* at § 4123.01(C). We agree with the Plaintiffs that if an employee's malady does not fall under the definition of an "injury" in Ohio Rev.Code § 4123.01(C), then the exclusivity provisions of workmens' compensation do not apply.[7] *See* Arthur Larson, 2A *The Law of Workmen's Compensation* § 65.40, at 12–41 (1992).

With this background in mind, this Court must determine whether the Plaintiffs' emotional distress claim constitutes an "injury" under Ohio Rev.Code § 4123.01(C). The Ohio legislature excluded psychiatric injuries from workmen's compensation, "... except where the [psychiatric] conditions have arisen from an injury or occupational disease...." *Id.* at § 4123.01(C)(1).

■ In analyzing Ohio Rev.Code § 4123.01(C), the Ohio Supreme Court declared that workers' compensation does not apply to *purely* emotional injuries. *Kerans v. Porter Paint Co.*, 61 Ohio St.3d 486, 495, 575 N.E.2d 428, 434 (1991); *Hayes v. City of Toledo*, 62 Ohio App.3d 651, 654, 577 N.E.2d 379, 381 (1989) (same).[8] Consequently, in Ohio an employee does not receive workmens' compensation if the employee's damages are strictly psychological, and thus do not include physical manifestations or ramifications. *Id.*

■ Furthermore, before allowing an employee's lawsuit for emotional distress against an employer to proceed, Ohio courts have not only required a pure emotional injury, but also that the employee's emotional distress have a mental stimulus. In other words, workmens' compensation applies if the employee's mental injury has a physical stimulus or physical results.

In order to understand these concepts better, we must give a brief background to

---

7. We also note that some injuries may be covered under workmens' compensation, but in light of the facts of a particular case, the injuries are not compensable. Arthur Larson, 2A *The Law of Workmen's Compensation* § 65.50, at 12–49 (1992).

8. One commentator has noted, however, that:
To permit the imposition of tort liability in actions for emotional harm, some courts have drawn a distinction between emotional distress resulting in 'disability,' which is covered by no-fault benefits, and 'general emotional distress,' which is not. The basis for the 'general emotional distress' distinction is now beginning to erode, however, because the coverage of no-fault benefits is being expanded in a few jurisdictions to encompass 'mental anguish, mental distress or emotional suffering.' Jean C. Love, *Actions for Nonphysical Harm: The Relationship Between the Tort System and No-Fault Compensation (With an Emphasis on Workers' Compensation)*, 73 *Cal.L.Rev.* 857, 872 (May 1985).

the law on claims for workmens' compensation involving emotional distress. Workers' compensation claims involving emotional distress can be classified as "mental-mental" (mental stimulus, mental consequence), "mental-physical" (mental stimulus, physical consequence), or "physical-mental" (physical stimulus, mental consequence). *See* Arthur Larson, 1B *Larson's Worker's Compensation Law* §§ 42.20–42.25. Thus, claims which have a mental stimulus with purely psychological damages are called mental-mental claims, and so forth.

■ As discussed above, only an employee's mental-mental claims are actionable in the Ohio courts. Mental-physical claims and physical-mental claims are not actionable in tort because they are governed by the exclusivity provisions of workers' compensation law. *Id.* at §§ 42.21(a), 42.22(a) (courts uniformly have found compensability for mental-physical and physical-mental workmens' compensation claims). Instead, mental-physical and physical-mental claims are covered by workmens' compensation.

For example, in *Harover v. City of Norwood*, 48 Ohio App.3d 312, 549 N.E.2d 1194 (Hamilton Cty.1988), *appeal dismissed*, 47 Ohio St.3d 607, 546 N.E.2d 931 (1989), the court held that an employee could sue his or her employer for a psychological injury caused by mental or emotional distress—

the employee's mental-mental claim. Similarly, in *Mettes v. Transamerica Insur. Corp.*, 36 Ohio App.3d 180, 521 N.E.2d 1138 (1987), the court considered a workmens' compensation claim by a woman who alleged that she had a psychiatric injury caused by the stressful conditions she experienced at work. The court held that workmens' compensation did not cover the plaintiff's mental-mental claim. *Id.; see also Lewis v. Dwyer*, 1989 WL 33709 (Butler Cty.Ct.App. April 10, 1989) (workers' compensation does not bar an employee's emotional distress claim that had arisen because a supervisor had intentionally inflicted emotional distress). Thus, Ohio courts have agreed that under Ohio Rev.Code § 4123.01, an employee may sue her employer when a mental stimulus results in mental injury—a so-called mental-mental claim.

However, the case before this Court does not involve a mental-mental claim. The Plaintiffs here allege that they are suffering from an increased risk of disease, emotional distress in light of the increased risk of disease, and disease itself.[9] Thus, the Plaintiffs' injuries are not purely mental; rather, they allegedly involve physical afflictions as well.

■ Moreover, the Plaintiffs' claims arise from a physical, non-mental stimulus—alleged exposure to radioactive and other hazardous materials. However, an

**9.** We note that the Defendants argue in their Motion to Dismiss that the Plaintiffs' claims involve physical injury. The Defendants state that "Plaintiffs' claims arise from a physical, non-mental stimulus: bodily exposure to radioactive materials." Defendants' Reply, doc. 300, at 13–14. However, in their Response to the Plaintiffs' Petition under the Price–Anderson Act, the Defendants state that "[t]here are no claims of sickness, disease, death or actual bodily injury [by the Plaintiffs]." Doc. 295, at 13.

As a result of this patent discrepancy in the Defendants' position, this Court has turned to the Plaintiffs' Amended Complaint (doc. 31). In their Amended Complaint, the Plaintiffs allege that NLO released radioactive and other hazardous materials from the FMPC. Although the Plaintiffs have not specifically requested damages for personal injuries (other than emotional distress), the Plaintiffs have asked the Court to award medical monitoring. The Plaintiffs stated in their Complaint that medical monitoring:

... is necessary to ascertain the extent of the adverse impact of Defendants' conduct on Plaintiffs and class members, and is the only way by which to determine such adverse impact, to determine the increased risk of harm associated with and emanating from Defendants' wrongful activities; and to protect the health and safety of Plaintiffs and class members....

Doc. 31, at 41. Accordingly, based upon the Amended Complaint, we conclude that the Plaintiffs are claiming physical harm in the form of increased risk of disease, emotional distress over the increased risk of disease, and disease itself.

In any event, both parties to this litigation appear to change their claims and defenses to suit whatever argument is currently pending before the Court. The Court reminds the parties that the doctrine of judicial estoppel is equally applicable to both plaintiffs and defendants.

employee may not sue his employer in tort under Ohio law if there is a physical stimulus or a physical injury. In the case before the Court, the Plaintiffs have alleged a physical stimulus causing both physical and mental damages. Thus, the Plaintiffs' claims, other than for intentional tort, are barred by workers' compensation.

Other courts have reached a similar conclusion to the one we are now drawing. In *Silkwood v. Kerr–McGee Corp.*, 667 F.2d 908 (10th Cir.1981), *rev'd on other grounds*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), the administrator of Karen Silkwood's estate brought a personal injury claim based upon her exposure to plutonium as a laboratory analyst at a Kerr–McGee plant. The *Silkwood* court concluded that if an employee develops cancer because of exposure to radiation on the job, workmens' compensation is the only remedy available to the employee. *Id.* at 919. The court added that Karen Silkwood's hysteria and fear were also covered under workmens' compensation, because the hysteria and fear required medical treatment and examination. *Id.* Thus, the *Silkwood* court refused to permit a personal injury action in which the employee had mental and physical injuries caused by a physical stimulus.

Similarly, in *Building & Constr. Trades Dep't v. Rockwell Int'l Corp.*, 756 F.Supp. 492 (D.Colo.1991), the workers at the Rocky Flats Nuclear Weapons Plant brought suit against their employers. The workers sued for allegedly being exposed to radioactive and other hazardous substances. Although the plaintiffs did not have any physical injuries, their claims arose from the physical stimulus of radiation exposure. Consequently, the *Building & Constr.* court held the workers' suit was barred by workers' compensation. *Id.* at 494; *see also Kesecker v. United States Dep't of Energy*, 679 F.Supp. 726, 729–30 (S.D.Ohio 1988) (workers' compensation statute governed the claim of an FMPC employee for workplace exposures to radioactive materials); Joseph H. King, Jr., *The Exclusiveness of an Employee's Workers' Compensation Remedy Against His Employer*, 55 *Tenn.L.Rev.* 405, 426 (Winter 1988) ("[t]he trend has been to provide workers' compensation disability or medical benefits for ... [mental] injuries").

Several sound public policies underlie the requirement in Ohio that an employee must have a mental-mental claim before he may sue his employer.[10] Persons with mental-mental claims do not receive automatic benefits under workers' compensation, because employees often react differently to similar situations encountered in the workplace. Therefore, mental-mental claims may involve a relatively large degree of subjectivity. *See* Marc A. Antonetti, *Labor Law: Workers' Compensation Statutes and the Recovery of Emotional Distress Damages in the Absence of Physical Injury*, 1990 *Ann.Surv.Am.L.* 671 (New York Univ. Sch. of Law) (April 1992). Second, a significant risk of fraud exists in mental-mental claims, because of the nature of the damages and of the causation. Mental-mental claims are not as obvious to the eye as are claims involving some degree of physical causation or physical injury. *Id.* Third, an employee's perception of events surrounding the injury is often pivotal to a mental-

---

10. We recognize, however, that some scholars urge that mental-mental claims should be compensable under workers' compensation. *See* Arthur Larson, *The Law of Workmen's Compensation*, § 42.23 (1991). At least one court has adopted this approach. In *Sparks v. Tulane Medical Center Hosp. & Clinic*, 546 So.2d 138 (La.1989), the court found that a mental-mental claim was eligible for workmens' compensation. The court reasoned:

To exclude nervous disorders is to create an artificial barrier between other work-related injuries. How a worker's body reacts to a given situation can result in different types of injuries. What may cause one worker to suffer a heart attack (a compensable injury) may cause another worker to break down emotionally (a non-compensable injury.) *Id.* at 145 (quoting *Taquino v. Sears, Roebuck & Co.*, 438 So.2d 625, 627 (La.Ct.App.)), *writ denied*, 443 So.2d 597 (La.1983); *see also* Lawrence Joseph, *The Causation Issue in Workers' Compensation Mental Disability Cases: An Analysis, Solutions, and a Perspective*, 36 *Vand.L.Rev.* 263, 311 (March 1983) (the requirement of a physical stimulus or a physical injury assures only an appearance of genuineness and "... potentially frustrate[s] the purpose of the workers' compensation system.").

mental claim, thus increasing the amount of the subjectivity in a mental-mental claim. *Id.* A final problem with mental-mental claims is the difficulty encountered in determining whether the employee's mental injuries have been caused by work-related conditions or problems in the employee's personal life. *Id.* In general, a court has more flexibility in handling these problems than the workers' compensation system. *See* Lawrence Joseph, *The Causation Issue in Workers' Compensation Mental Disability Cases: An Analysis, Solutions, and a Perspective,* 36 *Vand. L.Rev.* 263, 310 (March 1983) (discussing how courts have more options to deal with mental injuries than does the workers' compensation system); *but see* Victoria L. Ruhga, Comment, *Mental Stress and Workmens' Compensation in Nebraska,* 69 *Neb.L.Rev.* 842 (1990) (proposing a statutory compromise whereby employees who can prove injury with a mental-mental claim would receive workers' compensation benefits).

In light of these difficulties, Ohio courts have reasonably determined that workers' compensation does not cover mental-mental claims. As a result, employees may sue their employer in tort for these claims. The severity of the difficulties discussed above in mental-mental claims is not present in physical-mental claims and mental-physical claims. Therefore, the workers' compensation system is applicable for physical-mental claims and mental-physical claims. Because the employees at the FMPC were allegedly injured by a physical stimulus resulting in mental and physical injuries, this Court concludes that the Plaintiffs' alleged injuries are encompassed under the definition of "injury" in Ohio workers' compensation law, Ohio Rev.Code § 4123.01. *See* Arthur Larson, 1B *Larson's Worker's Compensation Law* §§ 42.-20–42.25 (courts uniformly have found compensability for mental-physical and physical-mental workmens' compensation claims).

### C. Effect of the 1986 Amendments

The Plaintiffs next contend that workmens' compensation does not act as a bar in light of the Ohio legislature's intent when it amended Ohio Rev.Code § 4123.-01(C) in 1986. Before 1986, this statute defined "injury" as follows:

> (C) 'Injury' includes any injury, whether caused by external accidental means or accidental in character and result, received in the course of, and arising out of, the injured employee's employment.

*Id.* The 1986 amendments did not change this language, but added three specific exclusions from the definition, one of which is "[p]sychiatric conditions except where the conditions have arisen from an injury or occupational disease...." *Id.*

The Plaintiffs' argument is unpersuasive. Ohio courts drew a distinction between mental-mental claims and mental-physical and physical-mental claims after the enactment of the 1986 amendments. *See Harover v. City of Norwood,* 48 Ohio App.3d 312, 549 N.E.2d 1194 (Hamilton Cty.1988), *appeal dismissed,* 47 Ohio St.3d 607, 546 N.E.2d 931 (1989); *Mettes v. Transamerica Insur. Corp.,* 36 Ohio App.3d 180, 521 N.E.2d 1138 (1987); *Lewis v. Dwyer,* 1989 WL 33709 (Butler Cty.Ct.App. April 10, 1989). Thus, because the Plaintiffs' claims allegedly have a physical stimulus with physical consequences, the claims are subject to the exclusivity doctrine of workmens' compensation *under* the 1986 amendments to Ohio Rev.Code § 4123.-01(C). Accordingly, we do not find that the Ohio legislature intended to allow plaintiffs, such as the class in this case, to sue in tort for their mental-physical claims or physical-mental claims.

### D. The Dual Capacity Doctrine

The Plaintiffs implicitly argue that they may sue in tort under the dual capacity doctrine. The dual capacity doctrine permits an injured employee to sue her employer in tort when the employer acts in additional, distinct role other than as an employer. Jean Macciaroli Eggen, *Toxic Reproductive and Genetic Hazards in the Workplace: Challenging the Myths of the Tort and Workers' Compensation System,* 60 *Fordham L.Review* 843, 873 (April 1992). The Plaintiffs contend that NLO workers who resided near the FMPC

may sue their employer based upon their alleged exposures to radiation apart from their employment.

In the case before the court, the Plaintiffs, the Defendants, and the Court have focused on NLO's actions with regard to NLO's employees and frequenters, and employees of NLO's subcontractors. Since this case began, and throughout the statute of limitations trial, the Plaintiffs have argued that their claim is different from the residents lawsuit in *In re Fernald Litig.*, Case No. C–1–85–149 (S.D.Ohio) (J. Spiegel). The Plaintiffs' counsel explained during opening statements that "... the residents' lawsuit, or the neighbors' lawsuit, is fundamentally and completely different than this lawsuit for an intentional wrong...." Doc. 170, Tr. at 397 (Statute of Limitations Trial, Sept. 17, 1991). The Plaintiffs cannot now change the theory of their case without extreme prejudice to the Defendants. *See Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir.1982) ("[t]he doctrine of judicial estoppel applies to a party who has successfully and unequivocally asserted a position in a prior proceeding; he is estopped from asserting an inconsistent position in a subsequent proceeding"). Furthermore, in certifying and defining a class, this Court understood the Plaintiffs' allegations to involve workplace exposures exclusively. Any other alleged exposures class members may have received as neighbors of the FMPC were dealt with in *In re Fernald Litig.*, Case No. C–1–85–149 (S.D.Ohio) (J. Spiegel).

### E. Concealment

■ The Plaintiffs' next argument is that workers' compensation is not a bar to their allegations, because NLO tortiously concealed information concerning employees' workplace exposures. *See Delamotte v. Unitcast Div. of Midland Ross Corp.*, 64 Ohio App.2d 159, 411 N.E.2d 814 (1978) (Ohio Rev.Code § 4123.74 does not exempt an employer for civil liability for fraud when the employer intentionally withholds information from the employer). However,

a viable concealment claim falls within the intentional tort exception to workers' compensation. Thus, the Plaintiffs may pursue their concealment claim, but only as it relates to an intentional tort committed by the Defendants.

### F. Claims Against NL Industries

■ Finally, the Plaintiffs argue that, even if workers' compensation is a bar to their claims against NLO, the Plaintiffs' claims are still viable against NL Industries ("NLI").

■ An injured employee of a subsidiary corporation generally may file a tort action against the parent corporation. *Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir.1987); 30 A.L.R.4th 949, 951 (1984). In Ohio, however, a parent corporation may only be held liable in tort if the parent has taken an independent, affirmative action—an action apart from its relationship to the subsidiary. *Shelton v. Great Western Sugar Co.*, 701 F.2d 180 (6th Cir.1982); *see also Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 662 (6th Cir.), *cert. denied*, 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979); *First Nat'l Bank of Camden, Ark. v. Tracor, Inc.*, 851 F.2d 212, 214 (8th Cir.1988).

Based upon the Plaintiffs' Complaint, which we must accept as true for the purposes of considering a motion to dismiss, NLO and NLI are the same entity. *See* doc. 31. Therefore, if NLO and NLI are the same entity, this Court cannot hold that NLO and NLI are separate entities with regard to workers' compensation. *See Kesecker v. United States Dept. of Energy*, 679 F.Supp. 726 (S.D.Ohio 1988) (holding that workmens' compensation applies to both NLO and NLI for their activities at the FMPC). NLI, according to the Plaintiffs' Complaint, has not taken any independent, affirmative acts of negligence—an action apart from its relationship to NLO. Therefore, under Ohio law NLI is protected from tort actions filed by the employees of its subsidiary, NLO.[11]

---

11. Moreover, based upon the Plaintiffs' Complaint, NLI can only be found liable based upon a piercing of NLI's corporate veil. NLI's corporate veil may be pierced if NLI is the alter ego of NLO. *See Bucyrus-Erie Co. v. Gen. Prods.*, 643 F.2d 413, 418 (6th Cir.1981) (a corporate

### Conclusion on Workmens' Compensation Issues

We have found the Defendants' arguments to be persuasive. In essence, this Court holds that it should not disturb the legislatively sanctioned compact of workmens' compensation between employer and employee. In making this decision, the Court realizes that the employees of the FMPC have lost some of their counts in their lawsuit. Still, any injuries to NLO employees occurring on the job will receive automatic benefits under the workers' compensation system. Furthermore, under workers' compensation, the Defendants have waived all of their defenses—defenses that might have prevailed in this lawsuit. Moreover, the employees may continue their case against NLO for any intentional torts which NLO may have committed.

This Court's decision granting the Defendants' Motion to Dismiss, however, is not applicable to class members who were not employees at the FMPC. The exclusivity doctrine of workers' compensation does not bar lawsuits filed by non-employees. *See* Ohio Rev.Code § 4123.74. While all of the Plaintiffs' counts are still alive for non-employee class members, this Court has serious concerns over any counts for non-employee class members other than those which involve intentional tort or negligence. The Court plans to discuss which counts the Plaintiffs plan to pursue at trial for non-employees at the Final Pre-Trial Conference.

### PLAINTIFFS' REQUEST FOR A PETITION AND PLAN UNDER PRICE–ANDERSON

■■■ The final matter before this Court is the Plaintiffs' request for the production of information by the Department of Energy ("DOE") under the Price–Anderson Act.

To better understand this request, we must first briefly examine the Price–Anderson Act. Congress enacted the Price–Anderson Act in 1957 in order: (1) to assure adequate public compensation in the event of a nuclear accident; and, (2) to encourage private industry to participate in the development and use of nuclear energy. *See* 42 U.S.C. §§ 2011, 2013; S.Rep. No. 100–70, 100th Cong., 2d Sess., 13 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1424, 1426. In attempting to accomplish these dual objectives, Congress set a ceiling on the aggregate public liability that can be imposed for a single nuclear incident. Furthermore, the Price–Anderson Act establishes a system of private insurance and public indemnity to pay for any nuclear accidents.

At issue now before the Court is the following Congressional directive:

> Whenever the United States district court in the district where a nuclear incident occurs ... determines upon the petition of any ... indemnitor or other interested person that public liability from a single nuclear incident may exceed the [applicable] limit of liability ... [t]he Commission or the Secretary, as appropriate, shall, and other indemnitor or other interested person may, submit to such district court a plan for the disposition of pending claims and for the distribution of remaining funds available.

42 U.S.C. § 2210(*o*). Under this statute, the Plaintiffs request the following: (1) a determination by the Court that the public liability from NLO's operations at the FMPC may exceed the Price–Anderson's Act's limitation on liability; and, (2) an order compelling the DOE to "... submit to [the] court a plan for the disposition of pending claims and for the distribution of remaining funds available ... [which] shall include an allocation of appropriate amounts for personal injury claims, property damage claims, and possible latent injury claims...." *Id.* The Plaintiffs have proceeded to proffer their own plan under the Price–Anderson Act.

However, a plan under the Price–Anderson Act must only be submitted

---

veil should be pierced only if: (1) the corporation has no separate mind or existence; (2) the domination was used to commit fraud or wrong; and, (3) the plaintiff was injured from

the control and wrong). Thus, if NLI is the alter ego of NLO as the Plaintiffs allege, NLI should be treated exactly as NLO is treated for purposes of workers' compensation.

where the "... public liability may exceed ..." the Price–Anderson aggregate liability limit. *Id.* In other words, 42 U.S.C. § 2210(*o*) is applicable only if the total damage committed by NLO's operations at the FMPC could exceed the aggregate liability limit under the Price–Anderson Act.[12] As originally written, the Price–Anderson aggregate liability limit was $500 million. However, in 1988 Congress amended the Price–Anderson Act, and increased the aggregate liability limit to somewhere around $7 billion.[13] Congress took this action in light of DOE's conclusion that this increase was necessary to ensure that private contractors would continue to be willing to perform work on various federal programs involving nuclear weapons. *See* H.R.Rep. No. 100–104, 100th Cong., 1st Sess., pt. 1, at 6 (1987).[14]

In the case before the Court, the Plaintiffs have requested medical monitoring and $200 million in compensatory damages and $300 million in punitive damages. *See* Amended Complaint, doc. 31. Obviously, the amount at stake in this case does not approach the aggregate liability limit under 42 U.S.C. § 2210(*o*). Therefore, the Defendants argue that the public liability cannot exceed the limit on liability; and consequently, the DOE need not submit a plan under the Price–Anderson Act.

█ The Plaintiffs only response to this argument is that because the Defendants'

activity occurred before the 1988 amendment to the Price–Anderson Act, the aggregate limit on liability is $500 million, not $7 billion. We disagree with the Plaintiffs' argument. Congress has provided that the increase in the limitation on liability is retroactive:

> All agreements of indemnification under the Department of Energy (or its predecessor agencies) may be required to indemnify any person, shall be deemed to be amended, on August 20, 1988, to reflect the amount of indemnity for public liability and any applicable financial protection required on the contractor under this subsection on such date.

42 U.S.C. § 2210(d)(3)(C); *see also* S.Rep. No. 100–70, 100th Cong., 2d Sess., at 20 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1424, 1433 (the 1988 amendment to the Price–Anderson Act "... provide[s] for retroactive increase in contractor indemnity to make the indemnification provisions of existing and former Department of Energy contracts coextensive with the new aggregate limit on liability under this legislation."); H.R.Rep. No. 100–104, 100th Cong., 1st Sess., pt. 1, at 23 (1987) (the 1988 amendment requires "retroactive indemnification of DOE contractors"). Both in the plain language of the statute and the legislative history, Congress has displayed its intent to increase the aggregate liability limit of the Price–Anderson Act for any

---

**12.** For the purposes of clarity, we note that the federal government must indemnify NLO for any liability NLO incurs in this case. *See* 42 U.S.C. § 2210(d)(1)(A); NLO–DOE Contract, Art. XXXVI (Attached as exh. 1 to doc. 3).

**13.** This $7 billion figure is arrived at through a complex process under 42 U.S.C. § 2210(*o*). *See* doc. 295, exh. 1. The Plaintiffs have not challenged the Defendants calculations of the $7 billion figure. Moreover, the $7 billion figure is supported by the legislative history of the 1988 amendments to the Price–Anderson Act. *See* H.R.Rep. No. 100–104, 100 Cong., 1st Sess., pt. 1, at 12 (1987).

However, the $7 billion dollar figure assumes that there are 109 large commercial power reactors. The United States had 109 large commercial power reactors in 1987. *See* H.R.Rep. No. 100–104, 100th Cong., 1st Sess., pt. 1, (1987). We are unsure, however, whether the number of large commercial power reactors has in-

creased or decreased since 1987. Therefore, we are unsure whether the aggregate liability limit is exactly $7 billion. In fact, one of the sources cited by the Defendants refers to a $6 billion liability limit. S.Rep. No. 100–70, 100th Cong., 2d Sess., at 12–13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1424–1426.

In any event, the precise amount of the new aggregate liability limit is not at issue. By examining the statute and its legislative history, we are sure that the 1988 amendments to the Price–Anderson Act have created an aggregate liability limit far in excess of what the Plaintiffs may obtain in this litigation.

**14.** Furthermore, Congress amended the aggregate liability limit, because "... the original limitation was arbitrarily determined and had little relationship to the amount of claims likely to arise from a catastrophic accident." H.R.Rep. No. 100–104, 100th Cong., 1st Sess., pt. 1, at 9 (1987).

lawsuits brought after the enactment of the 1988 amendment—regardless of whether the events involved in the lawsuit occurred before or after the 1988 amendment.

Therefore, we conclude that the Plaintiffs' request for a Petition and Plan under 42 U.S.C. § 2210(*o* ) from the DOE is not appropriate in this case, because the aggregate liability limit that Congress has set cannot be reached by the potential liability involved in this case.

### CONCLUSION

This Court has made a number of rulings in this Order. First, this Court's earlier decision in certifying a class will stand, and there shall be no interlocutory appeal from that decision. Furthermore, for class members who are employees, all of the Plaintiffs' claims other than for intentional tort are dismissed. For class members who were not employees, all of the Plaintiffs' claims are scheduled to be tried, subject to review at the Final Pre–Trial Conference. Finally, the Plaintiffs' request for a Petition and Plan under 42 U.S.C. § 2210(*o* ) from the DOE is denied.

SO ORDERED.